IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID L. WILSON,             )
                           )
               Plaintiff,      )
                           )
          vs               )      Civil Action No. 09-1492
                           )
NORTHERN WESTMORELAND    )
CAREER & TECHNOLOGY CENTER,  )
                           )
            Defendant.     )

## MEMORANDUM OPINION

Plaintiff, David L. Wilson, bring this employment discrimination and civil rights action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621-34 (ADEA), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII), and 42 U.S.C. § 1983 against the Defendant, Northern Westmoreland Career & Technology Center ("NWCTC"). He alleges that, when NWCTC terminated his employment as an automotive technology instructor on January 18, 2008, it discriminated against him on the basis of his age (55), gender (male), race (white), and protected First Amendment speech and union activity, and further that it denied him due process of law.

Currently pending for resolution is a motion for summary judgment, brought on behalf of the Defendant. For the reasons that follow, the motion will be granted.

Facts

Plaintiff is a white male with a year of birth of 1952. (Compl. ¶ 4.)[1] NWCTC provides vocational training to students in grades 10-12 from four school districts in Westmoreland County and is governed by the Joint Operating Committee of Northern Westmoreland Area

---

[1]      ECF No. 1.

Vocational-Technical School ("JOC"), which conducts regular meetings. (NWCTC 1157.)[2] NWCTC draws students from four school districts: Kiski Area, Burrell, New Kensington-Arnold and Franklin Regional. The JOC is composed of two members from each school district. (Kiefer Dep. at 7.)[3]

Kurt Kiefer ("Kiefer") is the current Director of the NWCTC and has been in that position since November 2007. (Kiefer Dep. at 4.) Kiefer was the Director at the time of Plaintiff's termination. (Wilson Dep. Ex. E.)[4] Kiefer's duties and responsibilities include the day-to-day running of the school, working on the budget, curriculum, disciplining of students and other administrative-type duties. (Kiefer Dep. at 4-5.) Coleen Steim ("Steim") is the Business Manager of NWCTC and has been in that position since 2003. (Steim Decl. ¶ 2;[5] Kiefer Dep. at 5.) Bruce Paul was the Executive Director of the Westmoreland Intermediate Unit and NWCTC's Chief School Administrator prior to 2003 until October 2007. (Steim Decl. ¶ 4.) Paul's assistant was Dr. Luanne Matta, who assumed his position of Executive Director upon his retirement. (Leyland Aff. ¶ 13.)[6] Marsha Welsh was the Administrative Director of NWCTC from March 2005 through July 2007. (Steim Decl. ¶ 5.)

Plaintiff was originally hired in 1998 to teach automotive technology at NWCTC, became tenured after three years, effective August 2001, and remained as a full-time instructor until his last day of full-time employment with NWCTC, January 18, 2008. (Wilson Dep. at 12-13, 33;[7] Wilson Dep. Exs. A, B; Wilson Aff. ¶¶ 18, 73.[8]) He was 45 years old when he was

---

[2]    Def.'s App. (ECF No. 29) Ex. C.
[3]    ECF No. 29 Ex. D. Kurt Kiefer's deposition was taken on April 22, 2010 in the case of Henry v. Northern Westmoreland Career & Technology Center, Civ. A. No. 09-751.
[4]    ECF No. 29 Ex. B.
[5]    ECF No. 29 Ex. E.
[6]    Pl.'s Br. (ECF No. 30) Ex. B.
[7]    ECF No. 29 Ex. A.

hired by NWCTC and 55 years old when he was terminated. (Wilson Dep. at 41.) Following termination from his full-time instructor position, Plaintiff continued to work at NWCTC on a part-time basis, teaching state safety inspection classes in the evening. (Wilson Dep. at 33-34.) He was not subject to any disciplinary action during his employment with NWCTC. (Compl. ¶ 6.)

Vocational Certificate Requirements

Pursuant to the Pennsylvania School Code, a teacher of vocational training must obtain certain instructional certificates. First, the teacher must obtain a Vocational Instructional I Certificate by having a minimum of two years of wage-earning experience, completing the occupational competency examination, completing 18 credit hours in an approved program and presenting evidence of satisfactory achievement on the assessment of basic skills. 22 Pa. Code § 49.142(a). Then the teacher must complete three years of satisfactory teaching attested to by a chief school administrator, complete 60 credit hours in an approved program, present evidence of satisfactory achievement in assessments of general knowledge and of professional knowledge and practice and complete an approved induction program to obtain a Vocational Instructional II Certificate. 22 Pa. Code § 143. The Pennsylvania Department of Education ("PDE") issues teaching certificates, including Vocational Instructional I and II Certificates. (Wilson Dep. at 27-28; Compl. ¶ 7.) 22 Pa. Code § 141(a).

At the time Plaintiff was hired, the Vocational Instructional I Certificate was valid for seven years, during which time the applicant had to complete the approved preparation program and obtain a Vocational Instructional II Certificate. However, PDE Regulations published September 25, 1999 (effective with Vocational Instructional I Certificates issued after October

---

[8] ECF No. 30 Ex. A.

1999) changed the number of service years that a Vocational Instructional I Certificate was valid from seven years to six years. (Wilson Dep. at 37-38; Wilson Dep. Ex. G at NWCTC 1008.) 22 Pa. Code § 142(b). See also ECF No. 29 Ex. F ("Level II Certification Commonly Asked Questions and Answers," Question No. 5)

Plaintiff was aware that he had to convert his Vocational Instructional I Certificate to a Vocational Instructional II Certificate. (Wilson Dep. at 19-20, 26-27, 29; Wilson Dep. Ex. C; Wilson Aff. ¶ 21.) He was also aware that he had a certain amount of time after he obtained his Vocational Instructional I Certificate in 2001 to obtain his Vocational Instructional II Certificate. (Wilson Dep. at 37-38.) However, he states that:

> I was hired in 1998. PDE regulations and NWCTC Director, Gary Russell, told me that I had up to ten (10) years to complete the vocational program, a vocational certification I and II and internship.
>
> In 1998 new applicants from industry received up to eleven (11) years to complete the vocational program. New applicants received a one (1) [year] Emergency Certificate, which I did not receive, three (3) years on an Intern Certificate, and seven (7) years on a Vocational I certificate, totaling eleven (11) years.
>
> Russell started me on an intern certificate instead of an emergency certificate. This reduced my time to complete the vocational program to just ten (10) years.

(Wilson Aff. ¶¶ 18-20.)

Plaintiff is Hired

NWCTC states that, on August 17, 1998, Plaintiff signed the General Application for Pennsylvania Certificate, which reflected in box 9 that he was applying for an "intern" certification. (NWCTC 0007.) A Vocational Intern Certificate is issued to an instructor who meets certain requirements but does not have a bachelor's degree. 22 Pa. Code § 49.151. This certificate is valid for up to three years from its date of issuance. 22 Pa. Code § 49.152.

By letter dated August 17, 1998, Indiana University of Pennsylvania ("IUP") sent a copy of Plaintiff's application to NWCTC, at his request. (NWCTC 0005-0009.) The August 17, 1998 letter reflected that Plaintiff "is a candidate for a teaching position at your school." (NWCTC 0005.)

Plaintiff responds that, although he signed the General Application, box 9 was subsequently completed by someone else. He also states that he has no knowledge of the August 17, 1998 letter being drafted or sent. (Wilson Aff. ¶¶ 30-31.) As noted above, he contends that Gary Russell mistakenly applied for him to receive an "intern" certificate, rather than an emergency certificate, which shortened the time he would have to obtain his Vocational Instructional II Certificate by one year. Plaintiff testified that, had he received the "emergency" certificate he would have received an "extra year" "to get acclimated" to teaching. (Wilson Dep. at 59-60; Wilson Aff. ¶ 20.)

NWCTC states that a JOC meeting was held on August 20, 1998, at which Plaintiff's application was considered. (NWCTC 0221.)[9] Plaintiff responds that he was told no meeting was held on that date because of a lack of a quorum. (Wilson Aff. ¶ 32.) Patrick Leyland, former member of the JOC, states that Plaintiff was actually hired at the September 1998 meeting, along with Interim Director Dr. Gary Russell. (Leyland Aff. ¶¶ 1, 19.) Plaintiff's employment agreement with NWCTC is dated September 17, 1998. (Wilson Dep. Ex. A.)

Plaintiff enrolled at IUP in December of 1998 and would have been permitted to begin taking courses in January 1999. (Wilson Dep. at 39-40.)

Plaintiff Obtains Tenure and His Vocational Instructional I Certificate

---

[9]     The record citation indicates only that a meeting was scheduled for August 20, 1998, not that it actually took place.

At a JOC meeting on August 16, 2001, NWCTC approved "the Professional Employee Agreement of Dave Wilson, Auto Mechanics Instructor, who has satisfactorily completed three (3) years of employment and now qualifies as a tenured teacher." (Wilson Dep. Ex. B ¶ 20.) He signed the General Application for Pennsylvania Certificate Form PDE 338G on October 17, 2001, and it was then signed by IUP on December 10, 2001. (NWCTC 1467-1468.) The Vocational Instructional I Certificate was issued to him by PDE on December 1, 2001. (Wilson Dep. at 35, 40-41; Wilson Dep. Ex. D.)

IUP records indicate that Plaintiff took 6 credits toward his Vocational Instructional II Certificate in Fall 2003, 3 credits in Spring 2004, 3 credits in Fall 2004, and 3 credits in Fall 2005. The last semester that Plaintiff took any required courses at IUP was Fall 2005. (Wilson Dep. Ex. F at NWCTC 1453.) At his deposition, Plaintiff admitted that he did not take any courses towards his Vocational Instructional II Certificate in 2006 or 2007. (Wilson Dep. at 73-74.) However, in his affidavit, Plaintiff states that he completed the Pennsylvania Auto-Emissions Repair Training Program and Enhanced Emissions Inspector Certification Training Program in 2006 and that he passed the Praxis II exam in 2007. (Wilson Aff. ¶¶ 11, 17.)

The PDE Audit

In March 2007, PDE audited NWCTC. (Wilson Dep. at 30-31; NWCTC 1476-1493.) PDE's Final Report indicates that Plaintiff's Vocational Instructional I Certificate would lapse in December 2007. (Wilson Dep. at 30-31; NWCTC 1479.) As discussed in further detail below, the Final Report also noted that John Sterosky (white male with year of birth 1955) and Shawn Grisson (black male with year of birth 1969) had Vocational Instructional I Certificates that were about to lapse, one in June 2007 and the other in July 2007. (NWCTC 1478-1479.) Neither Sterosky nor Grisson obtained a Vocational Instructional II Certificate within the statutory

period, and both were terminated by NWCTC.  (Wilson Dep. at 20, 22.)

During the audit, it was also discovered that Robert Visk (Dean of Students) was performing a job that he was not certified to perform. (Wilson Dep. at 31-32; NWCTC 1486-1487; NWCTC 1494-1495; Kiefer Dep. at 33-34.)  Because Visk was not certified, NWCTC was penalized $6,455.76.  (Wilson Dep. at 31-32; NWCTC 1496-1498.)

<u>Requests for Emergency Certificate</u>

NWCTC states that it issued Plaintiff three letters (dated July 15, 2006, March 20, 2007 and June 13, 2007) advising him that his Vocational Instructional I Certificate would expire in January 2008.  (Wilson Dep. at 18-19, 28-29; Compl. ¶ 10; Wilson Dep. Ex. C.)  Plaintiff responds that he received only the June 13, 2007 letter, which indicated that his certificate would expire in December 2008.  (Wilson Aff. ¶ 28.)  NWCTC states that this was a typographical error.  (ECF No. 28 at 4 ¶ 26 n.6.)

Plaintiff stated at his deposition that he did not recall specifically receiving the July 15, 2006 and March 20, 2007 letters but he was "not denying that [time] was running out.  I knew months ahead of time it was running out."  (Wilson Dep. at 29; see also Wilson Aff. ¶ 27.)

Plaintiff approached NWCTC Administrative Director Marsha Welsh in June 2007 to request her assistance in obtaining an emergency certificate, but she declined to assist him, stating that she would be leaving her position in the near future.  (Wilson Dep. at 19-21, 76; Wilson Aff. ¶ 34.)  He testified that the reason he did not enroll in any classes at IUP after his June 2007 meeting with Welsh was financial as he "had two kids in college." (Wilson Dep. at 76-77.)  Plaintiff stated that he told former Executive Director Bruce Paul that, in exchange for allowing him time to complete his credits to obtain his Vocational Instructional II Certificate, he would reimburse NWCTC for any monies "lost" through an audit.  (Compl. ¶ 9; Wilson Dep. at

31-32.)  He acknowledges that NWCTC would reimburse and had reimbursed him for tuition after the course was successfully passed. (Wilson Dep. at 69-71; NWCTC 1028.)  He testified that another reason why he did not take any courses in 2006 or 2007 was because of a health condition which caused him "to miss some work." (Wilson Dep. at 80.)

Plaintiff further testified that he did not obtain the 27 credits in either 2006 or 2007 because he was not familiar with the online classes and "was awful busy." (Wilson Dep. at 78.) He testified that, in addition to his Union meetings and teaching night school, Welsh had expected him to serve on the strategic planning committee. (Wilson Dep. at 78-79).  The strategic planning committee met "once every couple weeks" and included "homework we had to follow up and see what we could find out about different things ...." (Wilson Dep. at 79.) Plaintiff also testified that he was asked to run for county commissioner in May 2007, but he "didn't spend a whole lot of time until the very end" and that "volunteers did most of it." (Wilson Dep. at 81-82.)

Plaintiff wrote a letter dated October 14, 2007 to Bruce Paul and the JOC requesting an emergency certificate, but received no response.  (Wilson Dep. at 150-52; Wilson Dep. Ex. CC at NWCTC 0988-0989; Wilson Aff. ¶ 36.)  He also wrote an email on December 23, 2007 to Executive Director Luanne Matta requesting her assistance in obtaining an emergency certificate, but she did not respond. (Wilson Dep. at 152-53; Wilson Dep. Ex. CC at NWCTC 0990; Wilson Aff. ¶ 37.)

NWCTC notes that, according to the IUP transcript, Plaintiff had attained 30 credits out of the required 60 credits needed for his Vocational Instructional II Certificate. (Wilson Dep. at 64-65, 83; Wilson Dep. Ex. F at NWCTC 1453; Wilson Dep. Ex. G at NWCTC 1008.)  Plaintiff believes that an additional three credits should be reflected on the IUP transcript. (Wilson Dep.

65-66.) He attempted to have 60 credits from his associate degree transferred to IUP. (Wilson Dep. at 153-54; Wilson Dep. Ex. CC at NWCTC 0991.) IUP told him that it was not going to accept the credits. (Wilson Dep. at 155.)

In his affidavit, Plaintiff states that this transcript was incorrect and that PDE has since verified for IUP that his Associate Degree in Specialized Technology is worth 60 credits, being from an approved and accredited state institution. (Wilson Aff. ¶¶ 14-15.)[10]

As of September 2007, Plaintiff required an additional 27 credits for his Vocational Instructional II Certificate. (Wilson Aff. ¶ 12.) He testified that, had he been given an additional year, until December 2008, obtaining the needed 27 credits was "doable." (Wilson Dep. 77-78.)

The Deadline Approaches

By letter dated December 21, 2007, NWCTC provided to PDE a "Documentation Worksheet for Determining Certificate Validity" and requested the date of certification expiration for Plaintiff's Vocational Instructional I Certificate. (Wilson Dep. at 36; Wilson Dep. Ex. E.) Plaintiff signed the Worksheet "under protest" because he had initially received an "intern" certificate rather than an "emergency permit." (Wilson Dep. at 59-60; Wilson Aff. ¶ 20.)

By letter dated January 16, 2008 (corrected January 24, 2008), PDE advised that Plaintiff's Vocational Instructional I Certificate would expire as of January 16, 2008. (Wilson Dep. at 35, 40-41; Wilson Dep. Ex. D.)

---

[10] Although the Court is required to acknowledge that a genuine issue of fact exists with respect to this fact and to construe all disputed facts in Plaintiff's favor as the non-moving party, it must be noted that Plaintiff has not submitted records to demonstrate that his transcript was corrected and, more importantly, the correction must have occurred after his deposition (taken on June 24, 2010), or more than two years after his termination and thus it cannot be considered material to the issue of whether Defendant discriminated against him in January 2008.

<u>Plaintiff's Certificate Expires</u>

On January 18, 2008, Plaintiff met with Kiefer and was informed that, due to the lapse of his teaching certification, his last day of employment with NWCTC would be January 18, 2008. (Wilson Dep. at 99; Wilson Dep. Ex. H.)

Plaintiff testified that he completed 18 or 19 credits in the Summer of 2008 which have been transmitted to IUP. (Wilson Dep. at 84-85.) Those 18 or 19 credits were taken at Butler Community College and Westmoreland County Community College, which he believes will be accepted by IUP. (Wilson Dep. at 11-12, 85-86.) NWCTC states that, according to PDE, "community college credits ... are not accepted towards Level II certification." (ECF No. 29 Ex. F, Question No. 15.)[11] Plaintiff responds that IUP has corrected his transcript and now recognizes his community college credits. (Wilson Aff. ¶¶ 14-15.)

<u>Unemployment Compensation</u>

Plaintiff filed for unemployment compensation benefits on January 20, 2008. His application was denied by the UC Service Center and on appeal to a referee on May 2, 2008 (Wilson Dep. at 106; Wilson Dep. Ex. P.) In his appeal of the referee's denial of unemployment compensation benefits, Plaintiff stated: "The sole reason I am not currently teaching at NWCTC is due to my union activity and NWCTC failure [sic] of fair, equal and consistent treatment for all." (Wilson Dep. at 111; Wilson Dep. Ex. N at NWCTC 0803 ¶ 4.e.)

NWCTC notes that Plaintiff testified at his deposition that he believed the sole reason for his termination was his union activity. (Wilson Dep. at 111.) In his affidavit, Plaintiff states that

---

[11]     The Court accessed the website referred to by Defendant and found this same information, even though the website had been updated to add two more questions and to reflect that Tom Corbett is the governor of Pennsylvania. Level II Certification Commonly Asked Questions and Answers,
http://www.portal.pa.us/portal/server.pt/community/commonly_asked_questions/8628/about_level_ii_certification, Question No. 17 (visited Feb. 14, 2011).

he believes his discharge was discrimination as evidenced by the timely charge he filed with the Equal Employment Opportunity Commissioner (EEOC). (Wilson Aff. ¶ 89.)

In his June 10, 2008 correspondence to the Unemployment Compensation Board of Review, Plaintiff again stated: "I believe this has been a retaliatory witch-hunt against Union Officers." (Wilson Dep. at 115; Wilson Dep. Ex. O at NWCTC 0810.) The Unemployment Compensation Board of Review affirmed the referee's decision to deny benefits on August 8, 2008. (Wilson Dep. at 119; Wilson Dep. Ex. P.)

Plaintiff appealed the denial of unemployment compensation benefits to the Commonwealth Court of Pennsylvania at Docket Number 1813 C.D. 2008. (Wilson Dep. at 121; Wilson Dep. Ex. R.) In its June 5, 2009 unreported Memorandum Opinion, the Commonwealth Court affirmed the decision to deny benefits. (Wilson Dep. Ex. R; ECF No. 29 Ex. G.)

Local Agency Law Hearing

On February 2, 2008, Plaintiff requested a Local Agency Law Hearing to challenge NWCTC's termination of him. (Wilson Dep. at 123; Wilson Dep. Ex. S; ECF No. 29 Ex. H at 19.) Prior to the hearing, the officer executed Plaintiff's subpoenas and his requested witnesses appeared for the hearing. (Wilson Aff. ¶ 80.) NWCTC states that a hearing was conducted on June 3, 2008 before Hearing Officer Bernard P. Matthews. (ECF No. 29 Ex. H.) Plaintiff responds that the hearing was scheduled but canceled in error before it was conducted. (Wilson Aff. ¶ 81.) In fact, what occurred was as follows.

Prior to the hearing, Robert Durrant, counsel for NWCTC, submitted a brief in which he presented a legal argument that Plaintiff was not entitled to a hearing because he had allowed his certification to lapse. When the hearing began, the Hearing Officer asked Durrant to elaborate on his argument. He contended that: 1) the lapse of Plaintiff's Vocational Instructional I

Certificate meant that he was no longer a "professional employee" under the School Code and thus he was not entitled to a hearing; 2) to the extent Plaintiff was arguing that he was treated unfairly, he should have presented this argument to the Secretary of Education; and 3) to the extent he was arguing that he was being retaliated against for his union activity, he should have presented that argument to the Pennsylvania Labor Relations Board (PLRB) and, in fact, he had already filed a charge with the PLRB. (ECF No. 29 Ex. H at 12-14.)

In response, Plaintiff's counsel, Charles Pascal, conceded the third point. (Id. at 14.) However, he argued that: 1) because NWCTC's act of refusing to support his application for an emergency certificate left him with no other forum in which to assert his rights, the act must be deemed an "adjudication" which is subject to review; and 2) Plaintiff had a legitimate expectation that he would be treated like other vocational instructors, that is, that he would have ten years in which to complete his certification, beginning with a one-year emergency certificate that he did not receive. (Id. at 14-20.) After a brief break was taken during which the Board met in executive session, the Hearing Officer returned and stated that:

> it would be my recommendation that the Board, sitting as a quasi-judicial body, find and conclude as a matter of law that Mr. Wilson is not certificated to teach and that as a result he is not a professional educator and, therefore, he's not entitled to the protection of the public school code, nor is he entitled to the Local Agency Hearing process through which he seeks to challenge his dismissal.
>
> So what I would recommend and what we'll do now is adjourn this hearing based upon the offer of proof and the legal arguments that I've heard. I will then submit to the Board my recommendations as to findings and conclusions. The Board will meet publicly on Thursday, June 19th to consider that recommendation and a formal written adjudication will be presented. And at that time a vote will be taken at a public meeting.

(Id. at 24-25.)

Final Matters

On June 19, 2008, a JOC meeting was held at which two resolutions were passed: 1)

Resolution C-5 adopted the findings of Hearing Officer Matthews and denied Plaintiff's appeal; and 2) Resolution C-6 terminated his employment because he "is not certificated to perform the work from which he was employed at the beginning of the 2007-2008 school year." (Wilson Dep. Ex. S at NWCTC 1450, Ex. T.) The last line of the Decision and Order states that Plaintiff "is advised that he has the right to appeal this decision to the Court of Common Pleas of Westmoreland County within thirty (30) days of the date of this decision." (Wilson Dep. Ex. T at NWCTC 1141.)

Plaintiff was present at this meeting. In addition, on June 23, 2008, Steim sent Plaintiff copies of the resolutions, findings of fact, conclusions of law and decision and order. (Wilson Dep. Ex. S.) At his deposition, Plaintiff acknowledged receiving them. (Wilson Dep. at 123, 125-26.) However, in his affidavit, Plaintiff states that he was not notified of his right to appeal and that he believes this information was deliberately withheld from him. (Wilson Aff. ¶ 88.) This statement directly contradicts his deposition testimony.

Pursuant to the sham affidavit doctrine, "a court will disregard an affidavit that is inconsistent with an affiant's prior deposition testimony … unless the party relying on the affidavit in opposition to the motion can present a legitimate reason for the discrepancies between the deposition and the affidavit." Smith v. Johnson & Johnson, 593 F.3d 280, 285 n.3 (3d Cir. 2010). Plaintiff has not presented a legitimate reason for this discrepancy. Therefore, the Court will disregard the statement in his affidavit that he was not notified of his right to appeal.

Procedural History

On June 20, 2008, Plaintiff signed and submitted an EEOC Intake Questionnaire. (NWCTC 1097-1108.) On March 10, 2009, he indicated that he did not want his charge dual

filed with the Pennsylvania Human Relations Commission. (Wilson Dep. at 132-34, Wilson Dep. Ex. V.)

Plaintiff filed a complaint in this Court on November 8, 2009 (ECF No. 1). The complaint alleges that Defendant discriminated against him on the basis of his age (Claim A), gender (Claim B), race (Claim C), and in retaliation for First Amendment speech and union activity (Claim D), and further alleges that Defendant denied him his right to procedural due process under the Fourteenth Amendment (Claim E). On May 24, 2010, the parties filed consents and the case was assigned to the undersigned for all purposes on May 25, 2010 (ECF Nos. 23-25). On September 13, 2010, Defendant filed a motion for summary judgment.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

Defendant argues that: 1) Plaintiff cannot state a prima facie case of age, gender or race discrimination because his lack of a Vocational Instructional II Certificate rendered him unqualified to continue teaching in his position; 2) even if he could state a prima facie case, it has articulated a legitimate, non-discriminatory reason for his termination (his lack of certification) and he has failed to present evidence from which the trier of fact could conclude that this reason was a pretext for unlawful age, gender or race discrimination; 3) with respect to his First Amendment claim, assuming his union activities constituted protected speech, Plaintiff has failed to make a causal connection between them and his termination; and 4) with respect to his due process claim, Plaintiff had no protected property interest in his employment after he allowed his certification to lapse and, in any event, he received all the process to which he was due when notice was sent to him and a hearing was scheduled, after which he was notified that he had the right to appeal but elected not to do so.

Age/Gender/Race Discrimination Claims

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40. 29 U.S.C. §§ 623(a), 631(a). Title VII provides that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of that employee's gender or race. 42 U.S.C. § 2000e-2(a).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981). Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc).

As the Court of Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

The Court of Appeals has indicated that, to state a prima facie case of age discrimination, a plaintiff must establish that he is at least 40 years of age, that he is qualified for the position, that he suffered an adverse employment decision and that he was replaced by a sufficiently younger person to create an inference of age discrimination. Showalter v. University of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted). In a situation such as this one, a plaintiff can also satisfy the fourth element in this case by "showing that similarly situated non-protected employees were treated more favorably." Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002) (citation omitted). See McDonnell Douglas, 411 U.S. at 804 (African-American who had engaged in an unlawful traffic obstruction as a form of protest at the employer's location could maintain a case of racial discrimination arising out of the employer's failure to rehire him if he could proffer evidence that he was treated more severely than white employees who had engaged in the same conduct).

In the case of a plaintiff who is not a member of a protected class, the Court of Appeals has held that:

> a plaintiff who brings a "reverse discrimination" suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff "less favorably than others because of [his] race, color, religion, sex, or national origin."

Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999) (quoting Furnco Const. Corp. v. Waters,

16

438 U.S. 567, 577 (1978)).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Prima Facie Case

Defendant argues that Plaintiff cannot state a prima facie case of any kind of discrimination because his lack of certification rendered him "unqualified" to continue teaching in his position. It cites Narin v. Lower Merion School District, 206 F.3d 323, 332 (3d Cir. 2000), in which the Court of Appeals affirmed the district court's conclusion that a teacher who lacked certifications to teach mathematics and science failed to demonstrate that she was qualified to be hired for a position that required such certifications and thus failed to establish a prima facie case of age discrimination. However, in that case, the record was clear that the plaintiff lacked the qualification to be hired for a position. Here, by contrast, it is undisputed Plaintiff was qualified for the teaching position he held (in that he possessed a Vocational Instructional I Certificate), but a state law required him to acquire an additional certification within a specified time period, a requirement he failed to meet. Defendant has not cited any authority to support the conclusion

that this kind of requirement, outside the hiring context, should apply to render an employee "unqualified" at the prima facie case stage.[12]  Therefore, the Court will assume, without deciding, that Plaintiff has stated a prima facie case of discrimination.

Defendant's Proffered Reason and Plaintiff's Evidence of Pretext

Thus, the burden of production shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  NWCTC points to Plaintiff's failure to obtain his Vocational Certification II by January 2008, as required by state law.  Plaintiff admits that he did not do so.  Defendant has thus satisfied its relatively light burden of production.  Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997).

Plaintiff argues that this proffered reason is a pretext for unlawful discrimination and points to comparators to demonstrate that they received more favorable treatment.  In addition, he indicates that events occurred which shortened the time he had to obtain the certificate and argues that, if NWCTC had applied for him to obtain an emergency certification so that he had been granted an additional year at the end, he could have met the requirement.  Defendant contends that Plaintiff has not pointed to true comparators.  Further, it responds that Plaintiff's hypothetical situations do not demonstrate that its proffered reason is a pretext.

As Union President, Plaintiff was aware of two other individuals (John Sterosky, white male with year of birth 1955 and Shawn Grisson, black male with year of birth 1969) who failed to convert their Vocational Instructional I Certificates to Vocational Instructional II Certificates. (Wilson Dep. at 20, 26-27, 131.)  The lapsing of Plaintiff's, Sterosky's and Grisson's Vocational

---

[12]     In addition, the Court should not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action (namely that Plaintiff was fired for failing to obtain his certificate) when analyzing the prima facie case.  See Wexler v. White's Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (en banc); Thomas v. Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir. 1997); Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944 (8th Cir. 1994).

Instructional I Certificates was mentioned in PDE's Final Report of its March 2007 audit. (NWCTC 1478-1479.) Both Sterosky and Grisson were terminated from employment with NWCTC because they had not obtained their Vocational Instructional II Certificates. (Wilson Dep. at 20, 22.) Plaintiff believes that Grisson was treated better than he because, even though he was terminated for the same reason as he was, NWCTC kept Grisson's position open for a year. (Wilson Dep. at 131; Wilson Aff. ¶ 57.) However, he acknowledged that Grisson did not receive any emergency certificates while employed by NWCTC and that he was not re-employed by NWCTC. (Wilson Dep. at 132, 138-39.) Plaintiff has cited no authority to support the argument that a comparator who is also terminated for the same reason but whose position is "held open" received better treatment.[13] Therefore, this argument is rejected.

Plaintiff has not identified another instance in which NWCTC responded differently to this situation. At his deposition, Plaintiff admitted that he was not aware of anyone else at NWCTC whose Vocational Instructional I Certificate was about to expire, needed a Vocational Instructional II Certificate to continue teaching at NWCTC, and who received an emergency certificate. (Wilson Dep. at 95-97.)[14]

Rather, he points to other teachers who were afforded emergency certificates. Defendant responds that these individuals were not "similarly situated" because they were trying to obtain their Vocational Instructional I Certificates. It notes that the Commonwealth Court, in affirming

---

[13] Indeed, other than citing a few standards of review, Plaintiff's brief contains no citations to case law whatsoever.

[14] At times, Plaintiff's filings suggest that the adverse employment action he is challenging is not his termination, but NWCTC's refusal to assist him in obtaining an emergency certificate. However, framing the argument in this way does not alter the result, because Plaintiff cannot point to comparators who received an emergency certificate in this situation, because Defendant has explained that it has a policy of not requesting emergency certificates for instructors who fail to convert their Vocational Instructional I Certificates to Vocational Instructional II Certificates within the statutory period, and because Plaintiff has not proffered evidence from which the trier of fact could conclude that this reason is a pretext for unlawful discrimination.

the denial of Plaintiff's application for unemployment compensation benefits, concluded that Plaintiff had engaged in "willful misconduct" by allowing his certification to lapse and noted that Plaintiff "actually stated that he only knew of instructors who received emergency certificates for Vocational Certificates I, not II." (ECF No. 29 Ex. G at NWCTC 0838.)

Plaintiff contends that Jill Awes (white female with a year of birth 1967) received a Vocational Instructional I Certificate without ever having been an actual classroom intern or a student teacher, that Awes failed to pass her Praxis test and could not schedule another test prior to her certificate lapsing but NWCTC endorsed her and the PDE granted an exception, and that she was provided three emergency certificates, one even after he was discharged. (Wilson Aff. ¶¶ 44-45, 52; Wilson Dep. at 134-35.) NWCTC responds that Awes was provided with an emergency certificate prior to her receipt of a Vocational Instructional I Certificate because, although she had completed all of the requirements, the university mistakenly delayed her certificate. (Steim Decl. ¶ 7; NWCTC 1161.) She was not given an emergency certificate to complete her Vocational Instructional II Certificate.

Plaintiff contends that Mary Roncher (white female with year of birth 1964) was permitted to have ten years to complete just 30 vocational credits while he had just nine years to complete 60. (Wilson Aff. ¶¶ 47, 53; Wilson Dep. at 137-38.) NWCTC responds that Roncher did not receive an emergency certificate for either her Vocational Instructional I or II Certificate, but received an emergency permit before receiving her intern certificate. (Steim Decl. ¶ 8.)

NWCTC states that Nick Lombardo (white male instructor with year of birth 1964) was hired in February 1998. (Steim Decl. ¶ 6.) Plaintiff responds that Lombardo was hired at a JOC meeting on December 18, 1997. (Wilson Aff. ¶ 41.)

NWCTC states that Lombardo completed the course work necessary for his Vocational

Instructional I Certificate, but failed the required examination. Lombardo came in from private industry without a Vocational Instructional I Certificate and therefore NWCTC obtained an emergency certificate for him. Lombardo then studied and took the Vocational Instructional I Certificate examination, but failed it several times. Before his emergency certificate expired, Lombardo went to a psychologist at his own initiative and was diagnosed with a cognitive disability. Lombardo then personally petitioned the PDE to either be awarded a certificate or given an opportunity to re-take the examination with accommodations for his documented disability. In the interim and as part of the process of accommodating Lombardo's disability, the PDE granted a temporary emergency certificate to allow Lombardo to continue teaching. Lombardo obtained his Vocational Instructional I Certificate and later also successfully passed the Vocational Instructional II examination. (NWCTC 1161-1162.)

Plaintiff responds that Lombardo was provided three emergency certificates, two of which were requested and provided to him before he declared he was disabled, and NWCTC never made his position available to applicants or tried to replace him, as they did to Plaintiff. He further states that Lombardo traveled to Harrisburg with Executive Director Bruce Paul and Director Patricia Moyer, who endorsed him in getting his Praxis I test waiver and his third emergency certificate which granted him another year to work toward his Vocational Instructional II Certificate, that Lombardo was provided a total of 12 years to complete his Vocational Program and Plaintiff received only 9 years, and that when NWCTC posted Lombardo's position, it was only for a "substitute" replacement, which would have allowed him to return in the future when he was again certified, but Plaintiff's position was posted, before his discharge, seeking a permanent replacement. (Wilson Aff. ¶¶ 41-43.)

William Schweikert (male with year of birth 1982) was originally employed as a culinary

aide.  Schweikert also served as a long-term substitute (for Shawn Grisson) and NWCTC was

required to obtain an emergency certificate for him.  (Steim Decl. ¶ 9.)  Plaintiff notes that

Schweikert was hired to assist Grisson but NWCTC denied his request for an assistant, that

Schweikert subsequently became the culinary teacher when Grisson was relieved of his teaching

duties for failure to convert his Vocational Instructional I Certificate to a Vocational

Instructional II Certificate and that NWCTC sought and received an emergency certificate for

Schweikert to keep Grisson's teaching position available for him during the entire 2007-2008

school year and to give Grisson additional time to obtain his Vocational Instructional II

Certificate.  (Wilson Aff. ¶¶ 58-60.)

Plaintiff contends that George Varre (white male instructor with year of birth 1973)

replaced him and that Varre received an emergency certificate from PDE when NWCTC

requested it, but that it refused to make this request for him.  (Wilson Aff. ¶ 49.)  NWCTC

responds that Varre had a Vocational Instructional I Certificate for small engine repair. Varre

taught auto mechanics from January 2008 through June 2008.  NWCTC states that Varre

received an emergency certificate to take the automotive technology occupation competency

examination only.  After Varre completed certification requirements for the auto mechanics

course, the JOC approved his hire in June 2008 as a full-time staff member. (Steim Decl. ¶ 10;

NWCTC 1162.)

Plaintiff contends that Sandy Scalise (white female with year of birth 1961) was provided

two emergency certificates, while he was not provided any.  (Wilson Aff. ¶ 54.)  NWCTC

responds that Scalise was employed as a long-term substitute for an instructor (Frank Rausch,

white male with year of birth 1944) who was on sabbatical.  Because the instructor's sabbatical

occurred during the course of two school years, it was necessary to obtain two emergency

certificates for Scalise as emergency certificates expire at the end of each school year. (Steim Decl. ¶ 12.)

NWCTC states that, during Steim's employment, NWCTC has never requested an emergency certificate for an instructor whose Vocational Instructional I Certificate was set to expire. (Steim Decl. ¶ 13.) Plaintiff responds that Steim was hired in 2003 and thus she was present when Director Marsha Welsh assisted Jill Awes in receiving an extension of time when her certificate lapsed due to failing her Praxis exam. (Wilson Aff. ¶¶ 44-45, 52.) However, as noted above, he has not demonstrated that Awes was similarly situated to him.

The Court of Appeals has held that a plaintiff "cannot selectively choose [his] comparator" in order to satisfy his burden of demonstrating that similarly situated persons were treated differently. Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 645 (3d Cir. 1998). Plaintiff cannot show pretext by citing NWCTC's differential treatment of other employees who were not similarly situated to him. Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 322 (3d Cir. 2000).

With respect to Plaintiff's other argument, the Court need not entertain it. He points to the fact that he was effectively denied an extra year in 1998 when he was issued an intern certificate rather than an emergency certificate. He also laments the Commonwealth's decision in 1999 to reduce the time period for obtaining Vocational Instructional II Certificates from seven to six years. Finally, he claims that he should have been provided an emergency certificate in 2007, which would have provided him an additional year in which to obtain his Vocational Instructional II Certificate.

Obviously, the Commonwealth's decision to reduce the time period for obtaining Vocational Instructional II Certificates for everyone (and not to grandfather in instructors who

were already in the system) has nothing to do with NWCTC.  And, although Plaintiff attributes the fact that he initially was issued an intern certificate rather than an emergency certificate to an error on his application by NWCTC's then-director, Dr. Gary Russell (Wilson Dep. at 59-60), he does not allege that this act constituted discrimination.

Finally, his contention that he would have met the requirement if NWCTC had requested an emergency certificate to provide him with another year cannot be reconciled with the fact that he made no effort and enrolled in no courses between January 2006 and January 2008. Defendant also explains that its policy is not to seek emergency certificates for teachers who have exhausted the time period established by the state for converting Vocational Instructional I Certificates to Vocational Instructional II Certificates.  (Steim Decl. ¶ 13.)[15]

Plaintiff's position is essentially that NWCTC's actions were "unfair" to him.  But an employment discrimination plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it could not have been the real reason." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997).   Alternatively stated, the "issue is whether discriminatory animus motivated [the decision], not whether [NWCTC] is wise, shrewd, prudent or competent."  Fuentes, 32 F.3d at 765.  Thus, Plaintiff's own subjective feelings that NWCTC's decision not to seek an emergency certificate for him was incorrect or unfair to him are insufficient to demonstrate pretext.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

---

[15]      It is noted that Plaintiff cites a School Code section which provides that PDE "may approve the issuance of an Exceptional Case Permit to a person at the request of a public school entity upon receiving evidence of exceptional circumstances requiring Department resolution of the staffing problem."  22 Pa. Code § 49.32.   However, he has not argued or demonstrated that NWCTC faced a "staffing problem" such that it could have justified a request for an emergency certificate in January 2008 in any event.

a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non discriminatory reasons." Fuentes, 32 F.3d at 765. Therefore, with respect to Plaintiff's claims of age, gender and race discrimination, the motion for summary judgment will be granted

Section 1983 Claims

It is provided in 42 U.S.C. § 1983 that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). See also Baker, 443 U.S. at 140; Graham v. Connor, 490 U.S. 386, 394 (1989).

First Amendment Retaliation Claim

As summarized by the Court of Appeals:

> A public employee's retaliation claim for engaging in protected activity must be evaluated under a three-step process. First, plaintiff must establish the activity in question was protected. For this purpose, the speech must involve a matter of public concern. Connick [v. Myers], 461 U.S. [138,] 147 [(1983)]. Once this threshold is met, plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (requiring courts to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through

its employees"). These determinations are questions of law for the court.

> If these criteria are established, plaintiff must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Lastly, the public employer can rebut the claim by demonstrating "it would have reached the same decision ... even in the absence of the protected conduct." [Id.]. The second and third stages of this analysis present questions for the fact finder...

Baldassare v. State of N.J., 250 F.3d 188, 194-95 (3d Cir. 2001) (other citations omitted).

Defendant argues that: 1) Plaintiff's lack of specificity regarding his protected activity means that he cannot demonstrate that he engaged in protected speech, even assuming that union activity is protected to the same degree as First Amendment speech; and 2) Plaintiff has failed to demonstrate any causal connection between his speech and his termination.

From approximately 2002 until his termination, Plaintiff held the position of Union President. (Wilson Dep. at 14; Wilson Aff. ¶ 75.) His duties as Union President included processing grievances and negotiating the 2005-2010 contract. (Wilson Dep. at 14, 18, 139-40.)

He states that he was "an aggressive union activist." (Wilson Aff. ¶ 61.) He indicates that he routinely aggressively challenged NWCTC and the JOC about a variety of issues, including the following:

> From 2005-2007, I publicly complained and complained in writing to parents, the CRAFT advisory committee, and the NWCTC about a ceiling at NWCTC collapsing under a student locker room and above a student classroom placing students in danger….

> In 2006, I aggressively defended Union V.P. John Sterosky against NWCTC during an accusal meeting which could have resulted in his discharge….

> On or about July 9, 2006, I wrote a complaint letter to the JOC Board accusing Executive Director, Bruce Paul, of intentionally misleading and misinforming the Board and other issues….

> In 2006, I filed six (6) grievances against NWCTC. Several of these were sensitive. One of these involved me complaining that NWCTC allegedly posted

teacher's confidential and personnel information on a publicly accessed internet website. My complaints resulted in a criminal investigation….

In the summer of 2007, I verbally complained before the JOC Board at a public meeting about Executive Director, Bruce Paul, providing the NWCTC assembly room to another program, Resolve West, without previously consulting [the] board. My complaint resulted in Paul being admonished by the Board members, specifically, Mary Bach. Paul was visibly upset with my speech.

(Wilson Aff. ¶¶ 67-71.)[16]

Plaintiff testified that at different times he would question how money was spent by the NWCTC and approved by the JOC. (Wilson Dep. at 142-46; Wilson Aff. ¶ 66.) He recalled that in 2006, one of the grievances proceeded to arbitration. (Wilson Dep. at 14-15.) Following the arbitration hearing, but prior to the arbitrator's decision, NWCTC withdrew its denial of the grievance. (Wilson Dep. at 14-16.)

As noted above, during the two schools years (2005-2006 and 2006-2007) that Marsha Welsh was the administrative director of NWCTC, Plaintiff filed six grievances against NWCTC. (Wilson Dep. at 17-18.) However, after Welsh left NWCTC (Summer of 2007), Plaintiff did not file any grievances as Union President. (Wilson Dep. at 18.)

Plaintiff states that, after Welsh left NWCTC, he was less vocal at the JOC meetings. (Wilson Dep. at 146.) At his deposition, he could not recall specifically whether or what he spoke about at JOC meetings in 2007. (Wilson Dep. at 143-48.) On September 7, 2007, following a meeting regarding Grisson and Sterosky's lapsed certificates, Plaintiff asked Bruce Paul for assistance regarding the upcoming lapse of his own certificate. (Wilson Dep. at 42-44.) Plaintiff testified that Paul laughed, said "you're the guy that brings me all the trouble . . . and now you're asking for my help" and then smiled. (Wilson Dep. at 42-44; Wilson Aff. ¶¶ 35, 64.)

---

[16] As indicated in the Order dated January 28, 2011 (ECF No. 35), the Court is disregarding the portions of Plaintiff's affidavit that are inappropriate, such as the conclusion he offers at the end of each of these paragraphs that "NWCTC disfavored my speech and activity."

Plaintiff testified that he assumed Paul was referring to the grievances and arbitration. (Wilson Dep. at 42-44.) He also states that, afterward, he heard Executive Director Luanne Matta refer to him as a "troublemaker" when speaking to the JOC prior to his certification hearing. (Wilson Aff. ¶ 65.) See also Leyland Aff. ¶ 37.

Defendant argues that Plaintiff asserts that he engaged in protected speech, but does not identify the particular speech at issue. It would appear that he has identified specific instances of speech in his affidavit. Moreover, his claim of union association does not differ materially from his other alleged protected activities and may be treated the same way. Sanguini v. Pittsburgh Bd. of Educ., 968 F.2d 393, 400 (3d Cir. 1992). The Court will assume, without deciding, that Plaintiff engaged in First Amendment protected activity. Nevertheless, his claim fails for an independent reason.

Specifically, Plaintiff has failed to demonstrate a causal connection between his protected activity and the termination. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted). Plaintiff does not specifically say he spoke on issues involving building repairs and budget during the year preceding his termination (namely 2007) and he describes his union activity as dissipating during that time.

The only evidence Plaintiff submits to support the existence of ongoing antagonism consists of: 1) a remark, attributed to Bruce Paul in response to Plaintiff's verbal request for an emergency certificate application in October 2007; 2) his verbal criticism of Paul at a JOC Board meeting in the summer of 2007; and 3) Luanne Matta's reference to him as a "troublemaker."

Defendant argues that theses stray remarks are insufficient to demonstrate a causal connection between Plaintiff's First Amendment activity and his termination. It cites a recent case in which a district court similarly found the plaintiff's evidence insufficient:

> Although Plaintiff has presented evidence that he may have had arguments with Administrator Gordon, he has presented no evidence that these arguments derived from Plaintiff's union status or particular union issues. Plaintiff highlights certain testimony by Administrator Gordon that supports the conclusion that the two had a tense working relationship, but, when viewed in the light most favorable to Plaintiff, this evidence does not permit a reasonable inference that Administrator Gordon discriminated against Plaintiff because of Plaintiff's protected union status. Plaintiff bears the burden of "establish[ing] that the exercise of his First Amendment rights played some substantial role in the relevant decision." Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000). In the absence of evidence that Administrator Gordon's treatment of Plaintiff's disciplinary action was motivated by retaliatory intent Plaintiff may not sustain a First Amendment retaliation claim on the basis of this event.

Baldani v. Township of Millburn, 2010 WL 2674488, at *6 (D.N.J. June 30, 2010) (footnotes omitted). It further notes that Judge Conti observed in an ADEA case that:

> No decisions of the court of appeals were found holding that stray remarks, standing alone, could reasonably be viewed as sufficient to establish pretext under the second prong of the Fuentes test. Instead, in those decisions holding that plaintiff produced sufficient evidence to survive summary judgment, there was substantial supporting evidence other than the stray remarks to support the denial of summary judgment.

Connolly v. The Pepsi Bottling Group, LLC, 2008 WL 4412090, at *12 (W.D. Pa. Sep. 22, 2008), aff'd mem., 347 Fed. Appx. 757 (3d Cir. Oct. 2, 2009).

Neither Bruce Paul nor Luanne Matta was a decision maker with respect to Plaintiff's employment. Rather, the decision was made by the JOC Board. Moreover, Plaintiff's complaint against Paul and Matta is not that they terminated his employment, but that they refused to help him obtain an emergency certificate. Thus, even if Plaintiff supported his claim that the reason Paul and Matta refused to help him obtain an emergency certificate was retaliation for his First Amendment protected activity, he still could not demonstrate that their actions (as opposed to his

own failure to obtain the Vocational Instructional II Certificate within the statutory period) was the cause of his termination. Plaintiff has failed to make a causal connection between his First Amendment and union activity and his termination. Therefore, with respect to his First Amendment retaliation claim, the motion for summary judgment will be granted.

Fourteenth Amendment Procedural Due Process Claim

The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. 14. The Court of Appeals has stated that a plaintiff who seeks to establish a procedural due process claim "must demonstrate that '(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide 'due process of law.''" Bilski v. Red clay Consol. Sch. Bd. of Educ., 574 F.3d 214, 219 (3d Cir. 2009) (quoting Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (internal citations omitted).

Defendant argues that Plaintiff has failed to establish that he was denied a property right as recognized under state law and that, even if he had, he received all the process to which he was due. Plaintiff contends that he was entitled to a hearing under state law.

Property Interest

The Supreme Court has stated that:

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite.

Board of Regents v. Roth, 408 U.S. 564, 569-70 (1972) (footnote omitted). "Property interests, of course, are not created by the Constitution. Rather, they are created and their

dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." Id. at 577. "Whether a person has a legitimate entitlement to--and hence a property interest in--his government job is a question answered by state law." Hill, 455 F.3d at 234 (citing Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005)).

Defendant argues that, although the Pennsylvania School Code provides "professional employees" with the right to notice and a hearing before dismissal, 24 P.S. § 11-1127, the Code also defines "professional employees" as individuals who "are certificated as teachers," 24 P.S. § 11-1101(1). Based on this fact, several courts have held that, "upon the lapsing of a professional certificate, a public school employee immediately loses professional employee status" and is not entitled to a hearing. Moiles v. Marple Newton Sch. Dist., 2002 WL 1964393, at *7 (E.D. Pa. Aug. 23, 2002) (citing Occhipinti v. Board of Sch. Directors of Old Forge Sch. Dist., 464 A.2d 631 (Pa. Commw. 1983)). See also Correia v. Schuylkill County Area Vocational-Technical Sch. Auth., 2006 WL 1310879, at *2-5 (M.D. Pa. May 11, 2006), aff'd mem., 241 Fed. Appx. 47, 50 (3d Cir. June 20, 2007).

Plaintiff responds that the agreement between the JOC and the NWCTC Education Association for the years 2005 to 2010 provides that teachers could only be disciplined with "just cause" and further provides that teachers have a choice between two types of hearings before the JOC: 1) a hearing pursuant to the School Code; or 2) a hearing pursuant to the Local Agency Law of Pennsylvania, 2 Pa. C.S. §§ 551-55, 751-54. Plaintiff states that what he requested in writing was a Local Agency Law hearing, not a hearing under the School Code. (Wilson Aff. ¶¶ 76, 78.) Under the Local Agency Law: "No adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." 2 Pa. C.S. § 553. (Wilson Aff. ¶ 79.) The statute does not limit its coverage to

"professional employees" and thus, Plaintiff contends, his failure to obtain a Vocational

Certification II would not deny him the right to a hearing under state law. He argues that

NWCTC's representation to the Hearing Officer was irrelevant because his hearing had been

granted pursuant to the Local Agency Law and he did not have to be certified at the time of the

hearing for purposes of that act. (Wilson Aff. ¶¶ 82-84.)

However, the court in <u>Moiles</u> rejected this very argument:

> plaintiff argues that, even without professional employee status, he was still
> entitled to procedural due process protections under Pennsylvania's Local Agency
> Law, 2 Pa. C.S.A. §§ 551-555, which requires, *inter alia*, that employees of local
> agencies, including school districts, be provided with procedural due process
> protections before their employment is terminated. 2 Pa. C.S.A. § 553. Plaintiff's
> citation to the Local Agency Law does not advance his cause, however, because,
> as the Supreme Court of Pennsylvania has held, an employee is only entitled to
> due process protections under that law if the employee can "establish a legitimate
> expectation of continued employment through either a contract or statute." <u>Short
> v. Borough of Lawrenceville</u>, 548 Pa. 265, 696 A.2d 1158, 1158 (Pa. 1997). In
> light of this principle, plaintiff's Local Agency Law argument brings plaintiff
> back to the starting point. The only statute plaintiff can rely on to establish a
> "legitimate expectation of continued employment" is the Public School Code,
> which, as discussed, provides procedural protections-and, thus, an expectation in
> continued employment-only to professional employees who are certificated.
> Plaintiff was no longer a certificated professional employee as of January 29,
> 1998. Plaintiff's Local Agency Law argument thus does not provide any ground to
> support a procedural due process claim.

2002 WL 1964393, at *8.

Plaintiff has not addressed <u>Moiles</u> or <u>Short</u> or explained why their reasoning should not

be followed here. Plaintiff also argues that he "was at all times a 'professional employee' when I

taught and complained about being denied additional time and an emergency certificate. I

believe I could have also qualified as a professional employee and have had a hearing pursuant to

the Pennsylvania School Code if I had requested it." (Wilson Aff. ¶ 85.) However, the fact that

he <u>could</u> have requested a hearing under the School Code prior to the date his certificate lapsed

does not alter the fact that he did not do so. The Court concludes, therefore, that once Plaintiff

allowed his certification to lapse on January 18, 2008, he had no more "legitimate expectation of employment" under the School Code and thus the Local Agency Law does not provide any ground to support a procedural due process claim.

Plaintiff also argues that:

> On page eleven (11) of the Agreement, Article XIV, states that I had additional rights pursuant to the Public Employee Relations Act (PERA).

> PERA defines "professional employee" in Article III, Definitions (7) as any employee whose work: (i) is predominantly intellectual and varied in character; (ii) requires consistent exercise of discretion and judgment; (iii) requires [knowledge] of an advanced nature in the field of science or learning customarily acquired by specialized study in an institution of higher learning or its equivalent; and (iv) is of such character that the output or result accomplished cannot be standardized in relation to a given period of time, and on June 3, 2008, I met those requirements.

(Wilson Aff. ¶¶ 86-87.)

Defendant notes that, on or about May 19, 2008, Plaintiff filed a Charge of Unfair Labor Practices ("ULP") against NWCTC with the PLRB at Case No. PERA-C-08-191-W. (Wilson Dep. at 148; Wilson Dep. Ex. AA.) His ULP alleges that NWCTC retaliated against him because he "was the PSEA Union President." (Wilson Dep. Ex. AA at NWCTC 0526 ¶ 1.) On or about May 26, 2009, he provided the PLRB with his written request to withdraw the ULP. (Wilson Dep. at 148-50; Wilson Dep. Ex. BB at NWCTC 0530.) On June 19, 2009, the PLRB entered a Nisi Order of Withdrawal of the ULP pursuant to his request. (Wilson 148-50; Wilson Ex. BB.)

Thus, to the extent Plaintiff intended to assert a right under the PERA, the record indicates that he began this process but then withdrew his charge. He has not explained how he can maintain that he was denied his right to procedural process as a "professional employee" pursuant to the definition of the PERA when he chose not to pursue this remedy under state law.

<u>Failure to Follow Processes</u>

Defendant also argues that, even if Plaintiff could establish that he possessed a property interest in his employment, he received "all the process to which he was due" when he was provided a Local Agency Law hearing and failed to file an appeal in the Court of Common Pleas. Plaintiff argues that his "hearing" was inadequate because the Hearing Officer determined that he had no right to a hearing.

"In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her...." <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir. 2000). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get what he wants." <u>Id.</u>

Plaintiff admits that he failed to file an appeal. (Wilson Dep. at 127.) As the notice provided to him stated, he had a right to appeal to the Court of Common Pleas of Westmoreland County within thirty days of the date of the decision. <u>See</u> <u>Foster v. Board of Sch. Directors of Keystone Oaks Sch. Dist.</u>, 678 A.2d 1214 (Pa. Commw. 1996). Under well-settled case law, when a state "affords a full judicial mechanism with which to challenge the administrative decision" at issue, it provides adequate procedural due process, irrespective of whether plaintiffs avail themselves of the provided appeal process. <u>DeBlasio v. Zoning Board of Adjustment</u>, 53 F.3d 592, 597 (3d Cir. 1995), <u>overruled on other grounds</u>, <u>United Artists Theatre Circuit, Inc. v. Township of Warren, Pa.</u>, 316 F.3d 392 (3d Cir. 2003).

Plaintiff has failed to demonstrate that he had a protected property interest in his employment after January 18, 2008 and thus he was not entitled to a hearing. Moreover, even if he had a protected property interest, he has failed to demonstrate that he was denied due process

when he was notified that he had the right to appeal from the decision terminating his employment but did not do so.  Therefore, with respect to his procedural due process claim, the motion for summary judgment will be granted.

_____
LISA PUPO LENIHAN
United States Magistrate Judge

Dated:  February 28, 2011